UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

UNITED STATES OF AMERICA,                                    16-Cr-715 (JSR)

        -vs-

HAROLD LEVINE, et al.,

                Defendants.

-----------------------------------------------------------------X


**SENTENCING MEMORANDUM OF HAROLD LEVINE**


October 4, 2017

GERALD B. LEFCOURT, P.C.
Gerald B. Lefcourt
Sheryl E. Reich
1841 Broadway/Suite 910
New York, N.Y. 10023
212-737-0400 (telephone)
212-988-6192 (fax)
lefcourt@lefcourtlaw.com
reich@lefcourtlaw.com
*Attorneys for Defendant Harold Levine*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................................... ii

Factual Background .................................................................................................................... 3

   A.  Mr. Levine Objects to the Adjusted Offense Level Calculation in the PSR ......................... 6

      1.  There Should be No Upward Adjustment for Criminal Proceeds Under
         U.S.S.G§2T1.1(b)(1). ................................................................................................. 6

      2.  There Should be No Upward Adjustment for Obstruction of Justice Under
         U.S.S.G. §3C1.1 ........................................................................................................ 9

   B.  Mr. Levine's Background and Character Warrant a Non-Jail Sentence .............................. 12

        i.      Introduction ................................................................................................... 13

        ii.     Mr. Levine's Modest Background ................................................................. 14

        iii.    Mr. Levine's Professional Accomplishments ............................................... 16

        iv.    Mr. Levine's Struggle with His Health .......................................................... 18

        v.     Mr. Levine Build a Family ............................................................................. 20

        vi.    Mr. Levine Reaches Out to Help People ....................................................... 22

        vii.   Mr. Levine Takes Care of People Who Now Depend on Him ....................... 24

        viii.  Mr. Levine Has Expressed His Sincere Remorse .......................................... 26

   C.  The Correct Tax Loss/Restitution Amount ...................................................................... 27

The Legal Framework ............................................................................................................... 28

      1.  UNO Estates ............................................................................................................. 30

      2.  RKH/HF Allen .......................................................................................................... 32

      3.  The State Tax Credit Unreported Income Adjustment ............................................... 36

      4.  The Correct Tax Loss/Restitution Amount ............................................................... 36

Conclusion ................................................................................................................................ 37

Index to Exhibits ........................................................................................... last page

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Diamond v. Comm'r*,
56 T.C. 530 (1971), *aff'd*, 492 F.2d 286 (7th Cir. 1974) ........................................29

*Frelbro Corp. v. Comm'r*,
315 F.2d 784 (2d Cir. 1963).........................................................................................28

*Goodwin v. Comm'r*,
73 T.C. 215 (1979)........................................................................................................29

*Lashells' Estate v. Comm'r*,
208 F.2d 430 (6th Cir. 1953) .......................................................................................28

*Liddy v. Comm'r*,
49 T.C.M. (CCH) 932 (T.C. 1985), *aff'd*, 808 F.2d 312 (4th Cir. 1986)..............29

*North American Oil Consolidated v. Burnet*,
286 U.S. 417 (1932).....................................................................................................28

*In re Rodriguez*,
387 B.R. 76 (Bankr. E.D.N.Y. 2008)..........................................................................28

*United States ex rel. Edward O'Donnell v. Countrywide Home Loans, Inc.,* 822
F.3d 650 (2d Cir. 2016)..................................................................................................6

*United States v. Alba*,
933 F.2d 1117 (2d Cir. 1991)......................................................................................25

*United States v. Galante*,
111 F.3d 1029 (2d Cir. 1997)......................................................................................25

*United States v. Johnson*,
964 F.2d 124 (2d Cir. 1992).........................................................................................25

*United States v. Londono*,
76 F.3d 33 (2d Cir. 1996) ............................................................................................25

*United States v. Maloney*,
406 F.3d 149 (2d Cir. 2005).........................................................................................12

*United States v. Marinello*,
839 F.3d 209 (2d. Cir. 2016)........................................................................................11

*United States v. Sharpsteen,*
   913 F.2d 59 (2d Cir. 1990)..........................................................................25

*United States v. Sprei,*
   145 F.3d 528 (2d Cir. 1998)........................................................................25

*United States v. Werlinger,*
   894 F.2d 1015 (8th Cir. 1990) ...................................................................11

*United States v. Young,*
   811 F.3d 592 (2d Cir. 2016)........................................................................12

**Statutes**

26 U.S.C. §61(a) ..................................................................................28, 31

26 U.S.C. §7201 .............................................................................................1

26 U.S.C. §7212(a) ...............................................................................1, 9, 11

U.S.S.G §2T1.1(b)(1)....................................................................................6

U.S.S.G. §3C1.1.......................................................................................9, 10

This memorandum and the accompanying character letters and other exhibits are respectfully submitted on behalf of Harold Levine to assist the Court in determining the appropriate sentence in this case.  Mr. Levine has pleaded guilty to obstructing or impeding the due administration of the tax laws, in violation of 26 U.S.C. §7212(a), a three-year count, and evasion of taxes for tax year 2008, in violation of 26 U.S.C. §7201, a five-year count.  In doing so, he admitted to failing to include substantial income in his returns for each tax year 2005 through 2008, 2010 and 2011, as well as to making false statements to the IRS and causing another to do so.  He has admitted his wrongdoing; he has put in counsel's escrow account funds to pay the restitution as soon as the Court sets the amount; and he stands ready to be sentenced.

In the Presentence Report ("PSR"), the United States Probation Department calculated a United States Sentencing Guidelines' adjusted offense level of 21.  We believe the correct adjusted offense level is 17.  In Criminal History Category I, level 21 has an advisory sentence of between 37 and 46 months' imprisonment; level 17 has an advisory sentence of between 24 and 30 months.  As the Court is aware, these ranges are not mandatory.  Taking into account his extraordinary acceptance of responsibility; precarious health, particularly during the period of the offense; the degree to which others rely on him, including his role as sole caretaker of Marilyn Garber, his close friend suffering from lung cancer; his financial collapse; and considering the professional penalties he has already and will suffer, a sentence of community confinement or home detention is appropriate.  That would allow him to continue to manage his many health problems; care for his children; care for Ms. Garber; maintain an income to fund his ongoing financial obligations; and move on to the next phase of his life.

Letters to the Court from colleagues, family, friends, and Mr. Levine himself are collected at Exhibits A through C, and several are quoted below.  The writers detail Mr. Levine's

humble childhood, his work ethic, his bottomless concern for and assistance to others, his

professional competence, his health struggles and his remorse.  While all are important, most

notable is Mr. Levine's long history of caring for others.  Still, little prepares the reader for the

ways in which he has helped Ms. Garber in her struggle with a deadly and aggressive cancer.  As

she writes:[1]

> It took me a while to comprehend the fact that I had cancer.
>
> To say Harold was there for me in a time of need is an understatement.
>
> Harold was there for me, every scan, every doctor visit, trips to the ER and hospital.  My children were coming in on a rotating basis, but it was Harold who kept them informed and was able to answer their questions.
>
> He came when he could between his kids' activities, between work obligations.  Harold sat in the hospital day in and day out.  He was there morning noon and night he would come by, bring work with him, the newspapers.
>
> My cancer is considered stable.  For now I will never be cured.  Every day is a gift for me.  I am humbled and rendered speechless for all Harold did for me.  I don't think I'd be here today without him.

Ms. Garber's letter not only details his care for her through her illness and to this day.  Because

Ms. Garber has known Mr. Levine for 34 years, and has seen him go through the decline and

death of his mother, his two marriages, his illnesses, the births of his children, his successful

career to where he is now, she has particular insight into him.  We therefor urge the Court to

review her letter in its entirety as an introduction to who Mr. Levine is.

---

[1] Ms. Garber's letter appears as Exhibit "A".  Mr. Levine's letter to the Court is Exhibit "B".  All other letters are in alphabetical order and are collected as Exhibit "C".

## Factual Background

Harold Levine was indicted in October 2016 and charged in six counts for offenses related to his failure, from 2005 through 2008 and 2010 and 2011, to include in his tax returns certain income. There is no dispute that Mr. Levine failed to report substantial income. And, while there is a dispute as to the amount he failed to report and thus on the total tax loss, for Guidelines' purposes, the parties agree that the loss is between $500,000 and $1.5 million.

The unreported income was some, but not all, of the amounts Mr. Levine (and co-defendant Ron Katz) were given for introducing parties to a number of tax-advantaged transactions. A backdrop to all amounts paid to him is his relationship with Mr. Katz. Mr. Levine has had a long and close relationship with Mr. Katz, a CPA whose firm prepared Mr. Levine's tax returns at issue and who personally managed the tax reporting of all their jointly-owned entities. Starting well before the events at issue, Mr. Levine and Mr. Katz made many investments through jointly owned entities; identified investments for each other; and freely allowed funds to flow between them with limited recordkeeping. Mr. Levine frequently loaned amounts to Mr. Katz directly or made investments at Mr. Katz's request with a promise from Mr. Katz that Mr. Levine would be made whole.

The amounts at issue stem specifically from two types of transactions - State Tax Credit transactions and Corporate Sale transactions. The State Tax Credit transactions involved Missouri tax credits earned by a client of a Missouri attorney, Michael Markinson, in connection with the construction of low income housing. In or around 2003, Mr. Levine was asked by Markinson whether he knew of a potential partner who had losses and could join in a new entity with Markinson's client. The tax credits would be sold by the new entity and the gain allocated to the loss partner, thereby minimizing the taxes to be paid on the sale of the credits. Mr. Levine

introduced a man named Jeff Furman to Markinson.  Furman agreed thereafter, in recognition of Mr. Levine having made the introduction, to pay Mr. Levine a percentage of the profits Furman realized as the loss partner on each sale of tax credits.  The structure of the proposal was not Mr. Levine's and he was not asked his opinion of it.  Nor was Mr. Levine asked to opine on the *bona fides* of the losses.

At Mr. Levine's insistence, the law firm of which he was a partner, Herrick Feinstein ("Herrick"), would be asked to do the legal work to form one or more new partnerships between the loss partner and Markinson's client.  However, had Herrick not done the legal work, Mr. Levine would still have been entitled to a fee.  Herrick was paid for all legal work done on the transactions.

At some point, Furman became gravely ill (and later died).  Furman identified Sean McNabola as a person who would take over Furman's interests in various investments. McNabola presented to Mr. Levine and Mr. Katz his interest in identifying potential buyers to participate in Corporate Sale transactions.  Those transactions occurred when the stock of a corporate entity which held an asset or assets with significant appreciation was sold to a party that has losses, thereby allowing for the minimization of the tax to be paid on the sale of the appreciated assets.

Mr. Katz, and later Mr. Levine, identified potential sellers of companies with appreciated assets.  In exchange for such referrals, McNabola agreed to provide a fee for each such transaction.  He also agreed, again at Mr. Levine's insistence, that Herrick would do the corporate legal work involved in the purchase of the entity with appreciated assets.  Once again, Mr. Levine was never asked to opine on the *bona fides* of the losses in these transactions. Herrick was paid for all legal work performed in connection with these transactions.  McNabola

4

also later took over the State Tax Credit transactions and continued the fee arrangement entered into previously with respect to them, at some point paying Mr. Katz directly.

Though there is no pattern, a significant portion of the amounts paid to Mr. Levine over the years was not reported by Mr. Levine.  The government's original theory, as alleged in the Indictment, was that the unreported income was owed to Herrick and that Mr. Levine failed to report it because he sought to hide such amounts from Herrick.  Specifically, the government made the claim that the funds paid to Mr. Levine were an asset of Herrick pursuant to New York Partnership Law; a 2004 Herrick Investment Protocol; and/or the 2008 Herrick Partnership Agreement.  The government has substantially abandoned that theory and, as such, the government's false narrative of Mr. Levine's actions falls apart.  In fact, the income Mr. Levine failed to report was earned as outside income for introducing parties to one another in business transactions, and none was remuneration for legal services.  None of it was due to Herrick under any agreement or operation of law.  That said, Mr. Levine at all times had an obligation to report to the IRS the monies earned and, in each of 2005 through 2008, 2010 and 2011, he failed to report all of such outside income.

Consistent with sentencing practice in this District, we first address objections to the calculation under the Sentencing Guidelines, then address factors that inform where within the applicable Guidelines' range Mr. Levine should fall, as well as why a sentence outside the Guidelines should be imposed.  Finally, we address a number of  unresolved disputes as to the amount of tax loss, which is relevant for determination of the amount of restitution to be ordered.

A.   **Mr. Levine Objects to the Adjusted Offense Level Calculation in the PSR**

1.   **There Should be No Upward Adjustment for Criminal Proceeds Under U.S.S.G §2T1.1(b)(1)**

Following the government's lead, the PSR includes a two-level upward adjustment pursuant to §2T1.1(b)(1), which provides for an adjustment if the defendant failed to report income exceeding $10,000 and that income was from criminal activity.  Mr. Levine has admitted his failure to report substantial income in each of tax years 2005 through 2008, 2010 and 2011. He also concedes that the amount exceeded $10,000 of unreported income in each of those years. However, he disputes that any of the income was criminal proceeds.  As noted in the PSR (at 17, n.3), Mr. Levine reserved his right to object to this adjustment.

The government claims that the unreported income in each of 2008, 2010 and 2011, was money that should have been, but was not, turned over to Herrick under a provision of the 2008 Herrick Partnership Agreement.  It further argues that the failure to turn over these fees was a criminal fraud, and thus the amounts were the proceeds of criminal activity

We disagree.  Not every breach of contract is a fraud, and a good faith belief that the fees were not covered by the Partnership Agreement would take the fees out of the criminal realm, whether or not they were recoverable in a civil action.  *See United States ex rel. Edward O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650 (2d Cir. 2016).  For this income to be "criminal proceeds", it would have had to have been money or property owned by Herrick and which money or property Mr. Levine took from Herrick, by fraud, and with the intention of causing Herrick harm.  *See, e.g*., Judge Preska's recent decision in *United States v. Davis*, 13 Cr. 923 (LAP), Slip. Op, at 23-24 (S.D.N.Y. August 3, 2017) (discussing in detail the elements of a criminal fraud claim).

The government cannot overcome the hurdle that the fees were "money or property" of Herrick.  There is no theory under which the amounts would have gone to Herrick but for Mr. Levine's "diversion" thereof.  Instead, the only question is whether, under the Partnership Agreement, Mr. Levine was obligated to remit the amounts to Herrick once he received them.

An obligation to do so is not at all clear, to say the least.  Indeed, the language of the Agreement itself strongly suggests otherwise.

Mr. Levine began his association with Herrick in 2002.  When he joined, there was no agreement among the partners concerning either the disposition of outside income, such as a finder's fee, or the taking advantage of investment opportunities involving clients.  In 2004, an Investment Protocol was established that set standards for when investment opportunities should be offered to other partners, but there was still no curb on earning outside income from non-legal work.  In 2008, for the first time, the Partnership addressed the receipt of outside fees.  As set forth in the Partnership Agreement, at §6.2.4, ". . .all compensation payable on account of work done by an Equity Partner while he/she was still a lawyer at the firm (*e.g.*, finders' fees, brokerage commissions, royalties [etc.]) shall be payable to the Partnership 100%".  As explained therein, such earnings would, in the future, be payable over to the Firm in order to compensate the Firm for a partner's devotion of time to his own matters when instead his "full business time" should be devoted to the "business of the Partnership" §2.2.  In other words, the stated purpose of the new rule was to make sure there was no incentive for the partners to spend time making money for themselves that otherwise could be spent making money for the Firm.

By its terms, the new Rule it covered only work done from the inception of the Agreement, irrespective of the timing of the payment.  The Agreement makes no mention or in any way suggests that the Herrick partners intended that fees paid after the Agreement went into effect, but for which the time had already been spent previously, could be recouped.  Nor is there any evidence that anyone contemplated, let along agreed, that fees earned before the rule went into effect, but paid after, would be covered.  The 2008 Partnership Agreement was the first time the Herrick partners ever suggested that partners ought not be spending time earning outside

income for nonlegal work and the time doing so should instead be used for the benefit of the partnership.  The notion that, without expressing it, they intended the rule to be retroactive is fanciful.  At best, this is a civil dispute as to whether amounts should be turned over, not a criminal matter.

Since the government makes no claim about the monies received by Mr. Levine prior to entry into the Partnership Agreement (other than they all had to be reported to the IRS), we focus only on the income received after entry into the Partnership Agreement.  With respect to amounts relating to the State Tax credit transactions, all of the work done by Mr. Levine to warrant the payments was completed in 2003 or 2004 when he made the introduction of Furman to Markinson.  The only issue thereafter was determining the amount of the deferred payment, which was based on a percentage of the profit made by the loss partner.  No work was done on these transactions after the introduction and the timing of the payment is irrelevant vis-a-vis the stated purpose of the Rule.

Moreover, even if it were so that payments to Mr. Levine were earned not because of the original introduction but because transactions were entered into, these transactions took years. Payments made after 2008 are no indication of when the transaction was entered into.  Thus, in either case, no work was done after entry into the Partnership Agreement and therefore, no fees could even arguably be due to Herrick on these transactions.

As for the Corporate Sale transactions, the sole income from a Corporate Sale transaction that was received after the Partnership Agreement became effective was for one late 2008 transaction known as "VMH".  This transaction falls outside the Partnership Agreement for the same reasons the State Tax Credit fees were not subject to the provision: the agreement to pay an

amount on the VMH deal was set well prior to 2008, as was the time spent to warrant the payment, as we now detail.

In 2005, in a Corporate Sale transaction called "VMG", Mr. Levine put the parties together for what was contemplated then as a multi-phased transaction involving a number of single purpose entities, each of which had an interest in a single building.  The amount of the finders' fee was agreed to in 2005 and was set at a rate that took into account that there would be a series of transactions over a number of years.  Putting the parties together in 2005 was all Mr. Levine did to earn the fee.  That the 2008 VMH transaction was merely another phase of the same deal under the same terms is confirmed by the Herrick billing records reflecting the initiation of this later deal (annexed as Exhibit "D").  According to the records, the first work on the transaction, on September 8, 2008, was described as "work on NOF/VMG  add-on transaction".  (NOF/VMG was the original deal.)  Thus, the fee was not subject to the 2008 Partnership Agreement at least because, again, Mr. Levine was taking no time away from matters billable by Herrick.  Instead, the only time he spent on this matter in 2008 was billed by Herrick as legal fees and paid by the client to Herrick.  The nonlegal fee payment to Mr. Levine was for his introduction in 2005, well prior to the Partnership Agreement.

For these reasons, as to both the State Tax Credit transactions and the Corporate Sale transactions, the payments made after entry into the Partnership Agreement but earned prior are not covered.

### 2.  There Should be No Upward Adjustment for Obstruction of Justice Under U.S.S.G. §3C1.1

As noted in the PSR (at 17, n.4), the Plea Agreement reserves Mr. Levine's right to object to an adjustment under U.S.S.G. §3C1.1.  We do so here because making the adjustment results in impermissible double counting of the same conduct.

In full satisfaction of the charges, Mr. Levine pleaded guilty to two counts, including endeavoring to obstruct or impede the due administration of the tax laws, in violation of 26 U.S.C. §7212(a).  In the Indictment, among the means by which Mr. Levine is alleged to have violated that statute is by his "False Statements to the IRS and. . .Counseling of [another] to Provide False Testimony to the IRS" (Ind. at ¶12).  In entering his plea, Mr. Levine specifically allocuted to making untruthful statements to the IRS concerning the RKH transaction and that, prior to another witness appearing before the IRS on the same matter, he spoke with her with the expectation that she would also be untruthful in talking to the IRS.

The stated basis for the adjustment sought pursuant to §3C1.1 is that by this conduct, Mr. Levine "willfully obstructed or impeded, or attempted to instruct or impede, the administration of justice with respect to their investigation, prosecution or sentencing of the instant offense of conviction and the obstructive conduct related to the defendant's offense of conviction and any relevant conduct or a closely related offense" (at ¶50).  That is clearly not so.  The cited acts are the offense itself, which we know both because the Indictment so alleges and because Mr. Levine admitted it in his allocution upon his plea change.

The false statements have to do with the proper tax treatment of a house purchased by an entity owned by Mr. Levine and Mr. Katz and in which house Mr. Levine's then mistress resided.  The tenant did not herself pay any rent, but Mr. Levine personally contributed monies on her behalf to the entity that owned the house.  When questioned about the status of the house as an investment property, Mr. Levine and the tenant each untruthfully reported that she was paying rent, with the implication that she was an arms' length tenant.  Given the parties' personal situation, it is not difficult to imagine reasons for the charade.

It was alleged that the statements made to the IRS furthered the scheme to obstruct or impede the due administration of the tax laws.  Here, the substantive conduct for which Mr. Levine is being sentenced is the identical conduct that the PSR indicates should be relied upon to enhance the sentence imposed for the substantive conduct.  Some guidance as to whether this is permissible can be found in the Guidelines themselves.  Application Note 7 concerns those situations where the offense of conviction is one of several enumerated offenses, each labeled an "Obstruction".  The Note advises that, where the offense conduct itself is an obstruction, there should be no enhancement unless there is other obstructive conduct that is not part of the offense conduct itself: ". . . this adjustment is not to be applied to the offense level for that offense except if a significant further obstruction occurred during the investigation, prosecution or sentencing of the obstruction offense itself (*e.g.*, if the defendant threatened a witness during the course of the prosecution for the obstruction offense)".  The Note lists offenses where the adjustment would necessarily be double counting.  While 26 U.S.C. §7212(a) is not listed, that is not fatal to the analysis.  The Note makes it clear that, where the underlying conduct is itself an obstruction, the enhancement is not intended to apply where the very same conduct is cited as the basis for the enhancement.  The Note focuses, however, on those statutes that are narrowly focused on obstruction.  Section 7212(a) is not, **necessarily**, violated by conduct that is also an obstruction of a pending IRS investigation.  Indeed, according to a recent decision of the Second Circuit, the government is not required to establish that there was a pending IRS investigation to prove that a criminal defendant violated §7212(a).  *United States v. Marinello*, 839 F.3d 209, 219 (2d. Cir. 2016). Where, however, as here, the way in which the offense was committed is by obstructive conduct that would also serve as the basis for an enhancement, that same conduct should not be used for an enhancement.  *See United States v. Werlinger*, 894 F.2d 1015, 1017-18 (8th Cir.

1990) (Guidelines Commission did not intend the obstruction adjustment apply cumulatively to the same conduct and "recognizing that double-counting conduct in applying the Guidelines is inconsistent with the congressional goal of proportionality").

While the Second Circuit has not addressed these specific sections, we submit that under the present circumstances, the Second Circuit would not allow the double counting here.  Under Second Circuit law, only where multiple Guidelines sections applicable to a single act each serve a distinct purpose or are intended to address different harms is dual use of the same facts to make multiple adjustments or drive different outcomes appropriate.  *See United States v. Maloney*, 406 F.3d 149, 153 (2d Cir. 2005) (citing cases).  Where that is not so, double counting is not permitted.  *United States v. Young*, 811 F.3d 592 (2d Cir. 2016) (holding that the district court engaged in impermissible double counting in a conviction for unlawful distribution of firearms by applying an enhancement for trafficking in firearms).

Here, there are not discrete harms being addressed by the substantive offense and the obstruction enhancement.  Both provisions – the substantive one and the adjustment – are addressing the same harm committed by the same person.  Thus, no adjustment is warranted.

### B. Mr. Levine's Background and Character Warrant a Non-Jail Sentence

Familiarity with the background of a defendant is of assistance to a court both in determining where within the recommended Guideline range a defendant should fall, as well as in determining whether a non-Guidelines' sentence is appropriate and, if so, what that sentence should be.  We submit that here, a sentence within the range of the Guidelines, however the adjusted offense level is calculated, is not necessary to afford adequate deterrence to criminal conduct, pursuant to §3553(a)(2)(B).  There is no basis whatever to imagine that Mr. Levine must be jailed in order to teach him respect for the law.  Nor would a non-jail sentence

undermine the goals of general deterrence. Mr. Levine's conduct has shredded his professional life and standing in that community, torn apart his family, and ruined him financially. The threat of jail leaves him agonizing over what harm to his children and Ms. Garber his absence would trigger; and pondering whether incarceration will be a death sentence given his health situation.

The penalties and punishments that have already been visited upon him – through no one's fault but his own – combined with the fact that for him, a jail sentence has profound consequences not always present – make a jail sentence a far harsher punishment than may be intended and warrants a careful weighing against the benefits jail would serve here. Indeed, even the consequences to date send a strong message to the public of the dire consequences of such conduct; they are unlikely to be viewed objectively as worth risking for the benefits of nonpayment of taxes and lying to the IRS. Certainly, a long period of incarceration would be well in excess of what is necessary to deter him or others from such activity.

More to the point, home detention or community confinement is appropriate here because of the need to address three key factors: Mr. Levine's irreplaceable role as the sole caretaker of the gravely ill Ms. Garber; Mr. Levine's need to manage his health; and Mr. Levine's paramount concern that he be as close to his children as possible in order to continue to be a parent at this critical stage in their lives. We now demonstrate who Mr. Levine is and why home detention or community confinement is warranted.

### i.      <u>Introduction</u>

As noted above, in her letter to the Court, Ms. Garber describes Mr. Levine: "There are people in this world who give and there are people who take. Harold is a giver. He is not motivated by greed or self-aggrandizement. Harold is a good man who made a mistake, which he clearly understands and regrets." This is echoed in many letters. Allison Ames, a close friend

for over 30 years: "the [criminal] conduct does not represent who [Mr. Levine] truly is and has been throughout his life – a compassionate and caring friend and father".  Michael T. Bebon, Senior Vice President of Commonwealth Land Title Insurance Co. and a colleague and friend for 12 years: "I know him as a very kind and generous person who cares deeply about his family and friends, and he has demonstrated his commitment to service as he has helped others in need". "Through the decades, Harold has displayed an exemplary character of sincerity, support and compassion not only to me but to family members, neighbors, coworkers, and friends. Harold has always been a giver regardless to and not looking for anything in return", writes Bernard Bowen, who met Mr. Levine when Mr. Levine was running the New York Lawyers Basketball League and Mr. Bowen was the League's head referee.  Barry Rutcofsky, a partner at Kasowitz Benson Torres LLP, who has known Mr. Levine for 33 years, writes: "I have always known him to be a straight shooter with a keen awareness of the rule of law.  I am at a loss to explain the lapse in judgment that has led to this very sad and serious conclusion.  I can only regard his crimes as an aberration".

### ii.      Mr. Levine's Modest Background

As set out in the PSR, Mr. Levine grew up in a single parent home with two siblings.  His father, a genetics professor and author of several widely used undergraduate textbooks, simply walked out, abandoning his wife and children when Mr. Levine was three years old.  After a few visits in the first six months thereafter, the elder Mr. Levine never intentionally saw his children again.  Years later, the adult Mr. Levine accidentally met his father three times.  And when on one of those occasions Mr. Levine asked his father if he wanted to meet his grandchildren, the elder Mr. Levine rejected the offer.

As Joel Florin, a close friend since their days at Cardozo Law School, perceptively notes:

> I am privy to aspects of Harold's personal life. Harold's father abandoned his family when Harold was very young. I believe this abandonment has had a profound impact on Harold's personal and family life.

By all accounts, Mr. Levine's mother was an amazing woman. Prepared for the life of a wife and mother in an Orthodox Jewish home, Mrs. Levine had few skills that would earn the money to give her children the education she wanted them to have. So, she took a job as a secretary at an Orthodox Jewish school and thereby got for them free tuition.

Mr. Levine never forgot his responsibility to his mother and to the rest of his family. Writer after writer recounts Mr. Levine's singular devotion to his mother as she aged and ultimately passed away last year.

Ms. Garber writes:

> I met Harold's mother many years ago. She lived in a modest apartment in the Bronx. She had a favorite chair she liked to sit in. . . The love and bond between mother and son was evident when she was younger, and maybe even more so as she grew older and frailer and Harold was by her side. A more devoted, respectful loving son you couldn't ask for. Harold and I were out to dinner pretty late one night. It must have been about a month before she passed. Harold got a call that his mom was asking for him. He didn't hesitate; he simply said to me "gotta go" and drove up to Riverdale to sit with his mom.

Barry Rutcofsky, a partner at Kasowitz Benson Torres LLP, who has known Mr. Levine for 33 years, writes:

> This is the saddest piece I've written since my father's eulogy. While his mother was alive he was a doting son, visiting her weekly, talking to her often, bringing his children to visit her. He is also very close to his sister who has struggled mightily of late, simultaneously dealing with her ailing and now deceased mother and her very ill husband. Harold provides significant emotional and economic support for her and his brother-in-law.

Jack N. Schulman, a close friend for approximately 25 years:

> Not only is Harold a great friend but over the years I have seen what a wonderful and devoted father and son he is. Until his mother's recent passing, Harold was

15

a constant in her life and he made sure that she was a consistent presence in the lives of his children.

Dov Gordon, Mr. Levine's nephew, writes:

> There is no way [Mr. Levine's mother, the writer's grandmother] could have been cared for the way that she was without my uncle. The financial and emotional support he gave her throughout her life and especially at the end of her life is a kindness I will never forget.

And his sister, Marilyn Gordon, writes:

> When my husband developed a heart condition at a very young age, Harold was there to sit with me in the hospital and help me with my boys. He turned out to be an amazing uncle to my two boys Dov and Jonathan. After I had a very difficult delivery with my first son, Harold took me to the doctor and shopping as I could not drive for weeks. He made sure that the boys always had what they needed and gave me tremendous amount of support during those difficult times. He imparted a work ethic that my boys still thank him for.

### iii.     Mr. Levine's Professional Accomplishments

Mr. Levine is not a "taker". He worked throughout his teens and never stopped. As his sister, Marilyn Levine Gordon, recounts:

> Harold worked so that he could attend college, law school, and graduate school. He worked in a cousin's soda company and helped deliver soda. During the summers he worked at camp to make sure he had enough money for the coming year. He was able to complete his education while consistently working. Whatever he achieved he did by himself.

After working his way through college (Lehman College, CUNY), law school (Cardozo Law School), and an LLM (New York University), Mr. Levine has held responsible positions at several major firms. Immediately out of law school he worked at Arthur Anderson. He then became an associate at Kaye Scholer, where he worked for seven years. He then moved to Battle Fowler, starting as an associate and becoming a partner. After five years, he moved to Mintz Levin, also as a partner, and in 2003, he joined Herrick Feinstein, with which firm he was associated for over ten years. When he left Herrick as a result of fallout from this investigation,

he joined Morrit Hock, where he remained until the continuing investigation made his position

untenable.  For the past year, he has been working as a consultant, principally on real estate

transactions.

Throughout his career, Mr. Levine repeatedly earned a high degree of respect from

clients, colleagues and other professionals with whom he came in contact and from those he

mentored.

Marc L. Hamroff, a former law partner:

> Having worked with Harold on several significant and complex matters I can
> state unequivocally that Harold treated his coworkers, clients and opposing
> counsel with dignity and respect.  I have found his relationships with his clients
> to be sound, long-lasting and sincere.  Significantly, he was the complete team
> player in the office equally willing to lend a hand and work on matters whenever
> his tax and business experience was required.  He mentored many lawyers and
> was a valuable member of our partnership.  We miss his insight and guidance
> in the year since his departure.

David H. Cohen, a former law partner and close friend, writes:

> I worked with Harold on a daily basis and he was instrumental in structuring
> complicated real estate matters.  Harold was well liked and respected by our
> clients and opposing counsel. Harold treated his co-workers, clients and
> opposing counsel with respect.

Joel Florin, a fellow attorney and business client:

> Started by my father, over 85 years ago, [our business] is currently a second
> generation family business.  In addition to our friendship, Harold has been a
> trusted business advisor who has helped guide me through family business
> issues, helping me focus on my strengths and maximize what is still a thriving
> Brooklyn based manufacturing company.

Richard Sabella, who first met Mr. Levine in a professional setting in the late 1990s:

> The story of how Harold persuaded his older, large firm law partners to take on
> our unknown firm with a complicated and untested idea and then himself
> worked tirelessly to help us bring our concept to fruition is typical of the Harold
> Levine I know and have known for over 20 years. He has always had a generous
> spirit, a creative mind and a focus and dedication to the things that are important

17

to him and that all decent and civilized people hold dear – love of family, loyalty to and support of friends and good causes and a strong work ethic.

Randall Vaughn, who credits Mr. Levine with "helping [his] family save [the] family business of 70 years which we had thought had issues that could not be overcome".

Anthony Viscogliosi, who has known Mr. Levine for over 15 years:

> This was more than a lawyer trying to keep a client.  Harold and I bonded over a shared desire to do well by doing good.  For my brothers and I, our charitable endeavors focus on children, education, healthcare, and entrepreneurship. Harold's concern for others extended to his law firm and law partners.  Harold worked to expand our business with Herrick Feinstein, where Harold was a partner.  Because we trusted Harold, and because we were impressed with his colleagues, Harold grew his law firm's representation of our companies to include corporate, real estate, and litigation matters.

Anthony's brother, Marc R. Viscogliosi:

> When I needed to prepare a comprehensive estate plan, I went to Harold's firm to do the legal work. Not just because Harold had introduced us to great lawyers at his firm- he had, and he always did.  But because I knew that Harold was the one man that I would want to be executor of my estate.

### iv.     Mr. Levine's Struggle with His Health

As detailed in the PSR, Mr. Levine, who is 59 years old, has had a number of significant medical problems that have and remain a great source of anxiety and concern.  His lifelong weight problems that left him morbidly obese for much of his life, combined with heart problems, led, at age 43, to a quadruple bypass and, at age 52, to a stroke.  Several years ago, in complete and utter desperation, he had surgery that limited the amount of food he could ingest and he reduced to normal weight.  As his friend, Allison Ames, writes:

> In 2001, when Harold was only 43, he had to undergo open-heart surgery days before the birth of his son, J[ ].  Harold was released from the hospital five days before J[ ] was born.  In what has become a metaphor for the next 16 years of J[ ]'s life (as well as D[ ]'s), Harold put aside his own health issues to be there for his then wife, Lori, and their newborn child, take care of everything from bringing J[ ] and Lori home from the hospital, caring for J[ ] during the night, making the arrangements for the bris, among other responsibilities.  The focus

18

was never on Harold or his recovery but on his family as he put them ahead of his own needs.

To say that he is vigilant about maintaining his normal weight would be putting it mildly. He is deeply committed to staying healthy for his children; the fact that he had a quadruple by-pass weeks before his first child was born set that in motion. He has limited himself to a small number of acceptable foods in order to ward off the morbid obesity that is common in his family and which already profoundly impaired him.  And, as a diabetic, he self-administers daily injections.

Russell L. Berdoff, M.D., F.A.C.C., who has been Mr. Levine's cardiologist for the last 27 years:

> Harold became my patient in 1990. He has diabetes, and a very aggressive form of atherosclerosis which resulted in development of severe coronary artery disease in his early 30s. He had numerous hospitalizations over the ensuing years.  He underwent coronary stent procedures on several occasions, until March 2001, only a few weeks before the birth of his first child. At that time he became so unstable, with such extensive coronary blockages, that he required urgent quadruple coronary bypass surgery.  The procedure was successful, and since then he has taken extraordinary steps - even up to bariatric surgery - to maintain his cardiovascular health.
>
> Harold has now had a stable cardiac course, thanks to his vigilant attention to his health, but even with that suffered a stroke on Dec 25, 2015, losing function of the right hand.
>
> After hospitalization at Lenox Hill Hospital and a period of physical therapy, Harold battled back with now full recovery.  Prolonged incarceration, without the careful lifestyle changes he has undertaken, and medical care he has received, could significantly increase his risk of early stroke and heart attack, and their possible fatal complications.  In particular, he has had weight loss surgery to control his diabetes, yet remains on diabetes medications.  This combination requires careful dietary management which may not be available during incarceration. He also has strict diet requirements for control of cholesterol. Both strict diabetes control and very low cholesterol levels are critical to preventing progression of atherosclerosis.

In considering whether to incarcerate Mr. Levine and if so, for what length of time, we submit that consideration must be given to the impact incarceration can have on his health. The principal concern is not Mr. Levine's immediate health needs, should any arise. We appreciate that the Bureau of Prisons is equipped to deal with acute needs. What is of significant concern is that to maintain his health, Mr. Levine must maintain the food regimen that has, despite both genetics and disposition, kept him at a normal weight and avoided a relapse into life threatening morbid obesity. Limited access to healthful foods is not a preference or lifestyle problem; it is potentially life or death for him.

**v.      Mr. Levine Builds a Family**

An early marriage that ended in mutual agreement was followed by Mr. Levine's marriage to Lori Levinson, an attorney. Though they got along well and had mutual interests and values, after the birth of their second child, the pair began to drift apart. Eventually, home life became so intolerable that neither thought it was a tenable environment for the children. Mr. Levine ultimately moved out of the marital residence and he rents an apartment nearby. Mr. Levine and Ms. Levinson appear to have reached a very high level of cooperation with respect to the children, who split their time equally between the two parents. By all accounts, Mr. Levine's two children, J[ ], now 16 and entering his junior year of high school, and D[ ], 14, entering high school, are the loves of his life.[2]

Marilyn Garber, who has known Mr. Levine for decades, writes:

> He is a truly committed, devoted father, actively involved in his children's daily lives. He picks them up from school, he attends their sporting events, he talks and listens to his children, and he solicits their opinions and allows them to express themselves. He is a wonderful father.

---

[2] The names of the minors have been redacted.

To my mind, the most punishing aspect of Harold's mistakes here will be the effect on them of the time apart from their dad, especially given their ages. They are a wonderful, loving, tight knit family unit. Harold's being away will be so hard on all of them. I strongly believe it is J[ ] and D[ ] who will be impacted the most.  Taking this into consideration I respectfully urge the Court for maximum leniency.

Ivan Dochter, attorney and licensed real estate broker who has known Mr. Levine for ten years. writes: "I have never seen a more devoted father than Harold".

Eric Dochter, a friend and colleague:

Harold is a GREAT father.  I just saw him with the weight of this decision on his shoulders put it aside and talk with his daughter at camp for a half an hour with his ex-wife next to him.  Nothing mattered at that moment other than his daughter and her happiness.  His love of his family is paramount to him.

Steven B. Kauff, a friend for 20 years who, as a young lawyer, was mentored by Mr. Levine:

Harold grew up without a father. . . That was so, not because his father couldn't be there for him, but because he chose to abandon his family completely.  Is it a wonder Harold tries so hard to always be there for his children?

J[ ] Levine, Mr. Levine's son, tries to convey to the Court what having Mr. Levine as a father has meant to him:

Having had him as a guide, mentor and yes friend all these years, and then suddenly, losing him is unimaginable to me.

For me, ninth grade, two years ago, was probably the hardest time in my life that I can remember.  It wasn't directly because my parents were getting divorced, because that wasn't totally evident to me or my sister.  Neither was it because of an adjustment to high school or its increased demands.  The situation between my parents was so toxic that my dad felt the need to be out of the house many nights, until he knew my mom would be asleep.  For most of the winter I wouldn't see my dad until he got home, usually around midnight, but I waited up every night anxiously to hear the door open then I'd rush to greet him.  That experience gave me a very small taste of what not having my father around could mean to me, and it is deeply frightening.

21

I now live with my dad half the time and whenever I (along with my sister) am staying with him I have him 100% of the time.

Most of all, I fear what this whole situation could do to my sister.

And D[ ] Levine, Mr. Levine's 14 year old daughter, writes:

Although it has been a difficult for me, I know it has been much, much harder for him. Of course he cares what will happen to him but honestly, I know he cares more about the impact it will have on me and my brother.

One need not be a trained professional to appreciate the special pain that awaits Mr. Levine if he is separated from his children. Having lost his father through his father's choice, Mr. Levine has by all accounts worked tirelessly to be an available and involved father, despite the breakup of the marriage. Quite clearly, he has long had in mind that he would do everything he could to avoid letting his children bear the pain he felt growing up. Yet, here he is, having, through his own acts, put himself in the same relationship to his children that he swore he would avoid. As Ellis Reemer, attorney and friend, writes:

There is no question that Harold provides them with many of the things that money can buy, from private school to school vacations. But it would be a misunderstanding of what Harold has accomplished as a parent to think that Harold relies on buying them things to keep the relationship going. Harold is a supremely devoted father: he talks to his children and he listens to them. He makes every opportunity to spend time with them, whether picking them up from school just to take them a few blocks home, or taking them regularly to spend time with his mother before she died, all the while chatting about matters large and small. The thought of those bonds being broken in this critical time of these children's lives is devastating to any parent. To Harold, who has worked so hard not to be the father he had, it is heartbreaking.

### vi.     <u>Mr. Levine Reaches Out to Help People</u>

Of all the characteristics the letter writers chose to focus on, the most common was Mr. Levine's singular trait of simply taking on responsibility for others in need. When others say, "hey, somebody ought to do this", Mr. Levine just does it. For the most part, with the notable

exception of his involvement in the Wounded Warriors Project, Mr. Levine does charitable deeds

one on one, person by person.  While not to be belittled, it is easy to write a check.  But Mr.

Levine does not do that.  Largely shunning anonymous donations of money, he focuses instead

on helping individuals who are struggling because of sickness, financial setbacks, or other

challenges.  In each instance, Mr. Levine simply *does*.

William D. Briendel, a partner at Greenberg Traurig who has known Harold Levine for

30 years:

> Of all my friends, Harold was among the most supportive during this
> difficult time [wife's illness].  He called me frequently to check on her
> condition, provided much needed moral support, offered to have meals
> delivered to my house and repeatedly asked whether there was anything he
> could do to help.  His continuous support was heartfelt and meant a lot to
> me.

Melissa Goldman, an attorney who has known Mr. Levine for 20 years:

> Harold is also an extremely loyal friend.  I had a serious illness several years
> ago, and Harold was thoughtful and solicitous of my welfare, despite his
> own difficulties at the time.  As one example, he knew that I had lost my
> appetite as a result of treatment I was receiving, and he surprised me by
> preparing and delivering to my home my favorite foods.

Marylin Levine Gordon, Mr. Levine's sister:

> When my husband developed a heart condition at a very young age, Harold
> was there to sit with me in the hospital and help me with my boys.  He
> turned out to be an amazing uncle to my two boys Dov and Jonathan.  After
> I had a very difficult delivery with my first son, Harold took me to the doctor
> and shopping as I could not drive for weeks.  He made sure that the boys
> always had what they needed and gave me tremendous amount of support
> during those difficult times. He imparted a work ethic that my boys still
> thank him for.  Harold showed them and talked to them that you can achieve
> anything with hard work.

Peter Honerkamp, who has been a personal friend of Harold Levine for 30 years, and a

founder of the Wounded Warrior Project:

> Whenever I ask Harold for help with any cause, he never asks what I need; instead, he just asks what he can do to help.

Sung Hwang, an attorney who worked with Mr. Levine at Herrick, recounts at length the

support Mr. Levine provided when he, a Herrick associate, was torn between his responsibilities

to the Firm and his obligations as a soldier in the Army National Guard:

> In 2007, I had to take several weeks-long military leaves for pre-mobilization training throughout 2007 prior to a year-long leave of absence from Herrick, Feinstein LLP in 2008. When I broke the news to Harold, he not only patiently supported me through the several leaves of absence but also went to the firm management and obtained the approval to make up the difference between my military salary and the firm salary. Once I arrived in Afghanistan, Harold mobilized the firm to collect school supplies and sent them to me in Afghanistan to be distributed to local schools. I still remember that day when 10 file boxes full of school supplies were rolled into my make-shift office in Kabul to the amazement of all present!

Marla J. Wasserman, who met Mr. Levine when their sons began kindergarten together:

> When my son was in first grade and I was 39 years old, my husband, Craig, was diagnosed with a malignant brain tumor. My life was turned upside down in an instant. During what proved to be a very difficult 2 1/2 year period for me while Craig valiantly battled cancer (sadly, he died in 2010 when my son was in third grade), many school parents asked how they could help me but few followed through on their offers. Harold was an exception. Harold knew my son was a big New York Rangers fan and he included him on more occasions than I can count as his guest at games.

Thomas Barnard, a friend for 30 years:

> One evening I was speaking to him about my daughter's upcoming wedding and that I was meeting with my bank to discuss borrowing some money to help pay for the affair. He looked at me as if I had two heads and told me not to borrow from the bank that he would loan me the money.

### vii.    Mr. Levine Takes Care of People Who Now Depend on Him

One of the benefits of simply "writing a check" rather than getting involved in the

day to day struggles of individuals in need is that one cannot simply walk away. People

become dependent. Obviously, his mother was, and his sister is. But no one is more profoundly dependent, literally for her life, than Marilyn Garber. As she writes:

> Harold was there for me, every scan, every doctor visit, trips to the ER and hospital. My children were coming in on a rotating basis, but it was Harold who kept them informed and was able to answer their questions.
>
>    \* \* \*
>
> At some point early this year my scans started to show an improvement. The tumors began to shrink. My cancer is considered stable. For now I will never be cured. Every day is a gift for me. I am humbled and rendered speechless for all Harold did for me. I don't think I'd be here today without him.
>
>    \* \* \*
>
> There are people in this world who give and there are people who take. Harold is a giver. He is not motivated by greed or self-aggrandizement. He is warm and generous to a fault.
>
> He's the one they go to for advice and direction. The thought of any separation between them to my mind is unfathomable. The impact of a long separation on them will be irreparable.

Yes, others could have stepped up. But no one did. Only Mr. Levine.

Under the Sentencing Guidelines, a sentencing court may depart on the basis of extraordinary family circumstances. That is, where a court finds that personal circumstances make others "uniquely dependent on the defendant's ability to maintain existing financial and emotional commitments", the hardship that would be imposed on others by incarceration of the defendant may be exceptional and could warrant a downward departure under §3553. *United States v. Galante*, 111 F.3d 1029, 1034 (2d Cir. 1997); *United States v. Sprei*, 145 F.3d 528, 534 (2d Cir. 1998); *United States v. Sharpsteen*, 913 F.2d 59, 63 (2d Cir. 1990); *United States v. Londono*, 76 F.3d 33, 36 (2d Cir. 1996) ("This Court and other courts of appeals have recognized that a defendant's familial responsibilities may present such 'extraordinary circumstances' that a downward departure in sentencing is necessary and permissible").

When the Sentencing Guidelines were mandatory, the Second Circuit repeatedly upheld downward departures where such circumstances were present. *See, e.g., United States v. Alba*, 933 F.2d 1117, 1122 (2d Cir. 1991) (defendant's disabled grandfather who depended on the defendant's physical strength "to help him get in and out of his wheelchair"); *United States v. Johnson*, 964 F.2d 124, 129 (2d Cir. 1992) (defendant solely responsible for upbringing of four young children); *United States v. Galante, supra,* 111 F.3d at 1035 (defendant primarily responsible for supporting a wife and two children and where the defendant's wife spoke little English and had a limited earning capacity). Now that the Guidelines are no longer mandatory, consideration of such factors may still inform the Court's decision on the appropriate sentence.

Here, the extraordinary and unique dependence Ms. Garber has on Mr. Levine for her very survival should be taken into account – which the PSR recognizes (at ¶149). In sentencing Mr. Levine, we ask that the Court take into consideration the consequences to Ms. Garber and what will happen to her. A sentence of home detention or even community confinement would allow him to continue to care for her.

### viii.   <u>Mr. Levine Has Expressed His Sincere Remorse</u>

Mr. Levine has not just admitted his guilt here. He has also expressed, to his closest friends, his profound remorse for his actions.

David H. Cohen, a former law partner and close friend, writes:

> I have never heard him justify or rationalize his actions and the decisions he has made which has brought him before the Court. He has taken responsibility for his actions without excuse and understands that the consequences of his actions were far and deep.

Daniel Levy, a CPA who has known Mr. Levine for over a decade:

> I have had numerous heartfelt conversations and meetings with Harold. He is keenly aware of the gravity of his actions, and the pain his actions has caused

everyone, but mostly he inadvertently hurt his children. and wishes nothing more than to make amends for his actions.

We have quoted from a sampling of the letters sent to the Court by family, friends, colleagues and clients.  But in the end, it is the words of Mr. Levine themselves that express his deep regret for his conduct:

> I could give you so many reasons, excuses and justifications for my actions, but I won't.  There is no excuse for me having failed to report income.  None.  I take complete responsibility for what I did and there are no excuses.  I am deeply embarrassed and ashamed of what I did, most importantly because of what it means for those people whom I love and hold more dearly than I could ever express to you.

There has been no complicity here.  Mr. Levine has not told this Court one thing in admitting the crime and told his friends, family and colleagues something else.  He has been honest.

## C.  The Correct Tax Loss/Restitution Amount

Mr. Levine has fully admitted his wrongdoing in failing to report the income.  There is, however, as he stated in his allocution, a dispute as to the amount of unreported income, which in turn drives the tax loss.  While this has no impact on the Guidelines' calculation, since even with the adjustments we believe should be made the loss amount is still between $500,000 and $1.5 million, the tax loss does drive the restitution amount.  The government contends that there is a total of $2,949,294 in unreported income.  We contend that Mr. Levine failed to report $2,155,369.  According to the government, the total harm (federal, state and city tax loss) is $1,363,209; we contend it is $998,424.  Focusing solely on the federal liability, the government contends restitution should be in the amount of $1,048,854.  We contend the federal liability is $769,331.

The dispute concerning the amount of income that should have been reported concerns two transactions: UNO Estates and RKH/HF Allen.  Both of these transactions were completed in 2006.  Included in the government's calculation of total unreported income for 2006 is $280,000, which the government wrongly attributes to Mr. Levine for the UNO Estates transaction, and $525,000, which the government wrongly attributes to Mr. Levine for the RKH transaction.  The government insists that these amounts were income to Mr. Levine the moment he had "dominion and control" over them, evidenced by his sending them pursuant to a client's instructions, from Herrick's escrow account, where they were being held for the benefit of the client, to an account owned by a Levine and Katz owned entity.  For the reasons we set out below, the government is in error.  The correct amounts of unreported income attributable to Mr. Levine from those transactions is $40,518 from UNO Estates and $75,000 from RKH.  In addition, some $12,416, which the government claims should have been reported in 2006, was reported in 2005 and therefore should not be included in unreported income, either.

**The Legal Framework**

It is "well settled that the mere receipt and possession of money does not by itself constitute taxable income.  Familiar examples are borrowed money, rent collected by a rental agent, payment of a loss under an insurance policy, and a money judgment collected by an attorney for a client." *Lashells' Estate v. Comm'r*, 208 F.2d 430, 435 (6th Cir. 1953); *Frelbro Corp. v. Comm'r*, 315 F.2d 784, 787 (2d Cir. 1963) (taxpayer who receives a payment which he is not entitled by law or by contract to keep and which he separates from his own funds and pays to a third person or returns to the payor is held not to have received taxable income); *In re Rodriguez*, 387 B.R. 76, 87 (Bankr. E.D.N.Y. 2008).  The term "Gross income", as used in 26 U.S.C. §61(a), means the accrual of some gain, profit or benefit to the taxpayer.  This

requirement of gain, however, must be read in its statutory context, and not every benefit

received by the taxpayer will constitute gross income to him.  In determining what constitutes

gross income, mere dominion and control over money and property will not be decisive.  Rather,

all relevant facts and circumstances must be considered.  *Id*. at 415.

This concept of "gross income" was elaborated upon by the Supreme Court when it held

that a taxpayer who received amounts under a claim of right and without restrictions with respect

to its disposition must include such amounts in gross income.  *North American Oil Consolidated

v. Burnet*, 286 U.S. 417, 424 (1932).  The existence of a claim of right is negated, however, when

a taxpayer is required to make prompt payments of amounts received, even if such payments are

made in the absence of an enforceable obligation.  *Lashells'*, *supra*, at 435.  Therefore, amounts

received over which a taxpayer is acting as a mere agent or conduit are not required to be

reported as income.  *Goodwin v. Comm'r*, 73 T.C. 215, 230 (1979); *Diamond v. Comm'r*, 56

T.C. 530, 541 (1971), *aff'd*, 492 F.2d 286 (7th Cir. 1974); *Liddy v. Comm'r*, 49 T.C.M. (CCH)

932 (T.C. 1985), *aff'd*, 808 F.2d 312 (4th Cir. 1986).

Taken together, we do not agree that Mr. Levine having the authority, on the instructions

of a client, to move money to pay an obligation of the client is the exercise of dominion and

control that is required by the statute and case law to make the funds income to him.  Nor does

the movement of funds on behalf of an entity make those funds income to the actor.  Nor does

the receipt of funds into a partnership account make those funds income to each partner or to one

partner.

In that legal framework, we review the facts concerning the two transactions to determine

what of the amounts, if any, were income to Mr. Levine.

### 1. **UNO Estates**

The amount at issue is $280,000, the full amount of which the government contends was taxable income to Mr. Levine.  We contend that only $40,518 of it was income that should have been reported by Mr. Levine.

A chart annexed as Exhibit "E", along with the below short narrative, may help to clarify the issues.  (The documents underlying the chart entries are largely bank statements and were previously provided to the government.  We have not included them here but will make them available should the Court wish to review them.)  HRK Real Estate was an entity beneficially owned by Mr. Levine and Mr. Katz in equal parts.  At issue is who, as between Mr. Levine and Mr. Katz, received what amount of the UNO funds, which we believe are being confused with income generated by a separate transaction known as "PAF".

It is undisputed that on January 31, 2006, a wire came into the HRK account from the PAF transaction in the amount of $1,242,500.  Mr. Levine reported receipt of half that amount (less minimal expenses) as taxable income on his 2006 tax return.  Over the course of February 2006, Mr. Levine and Mr. Katz each received amounts of the PAF funds by way of transfers to their wholly owned entities (Mr. Katz's King Louie Enterprises and Mr. Levine's LL Real Estate).  Specifically, by February 10, 2006, Mr. Katz received in several transfers a total of $600,000 of the PAF funds (to King Louie Enterprises and then to his personal account), including on one occasion a transfer of $250,000; as of that date, Mr. Levine had received only $372,000 of the PAF funds.

On February 14, 2006, $280,000 came into HRK's account from a transaction unrelated to PAF and known as the UNO Estates transaction, as did amounts that were the proceeds of the sale of Monitor Oil stock, also unrelated to the PAF transaction.  The parties agree that Mr.

Levine reported his income on the Monitor Oil stock, which was owned by HRK.  On February 22, 2006, eight days after the UNO funds came in, Mr. Levine received $280,000, the bulk of the remainder of the PAF funds, bringing him and Mr. Katz to near equal distributions of the PAF funds of approximately $600,000 each.  However, because of the timing of this transfer of money to Mr. Levine, which was just eight days after the UNO funds came into the HRK account, the government ignores the PAF funds remaining in the HRK account and ignores the imbalance in the payment of PAF funds to Mr. Levine and Mr. Katz.  Instead, the government treats the February 22d transfer of funds to LL Real Estate as a transfer of UNO funds to Mr. Levine.  That is not correct.  We have found no evidence, and the government has not pointed us to any, that suggests that the funds paid to Mr. Levine on February 22d were UNO funds.  Nor can the government point to any other amounts that were transferred to Mr. Levine or his entity LL Real Estate that are the remaining PAF monies he was owed and which he reported and on which he paid taxes.

Instead, with respect to the UNO monies, we see that on March 1, 2006, with PAF funds exhausted, Mr. Katz received $150,000 from HRK of what could only be UNO funds.  On March 13, 2006, Mr. Katz received an additional $50,000 in UNO funds, for a total of $200,000 of the total UNO proceeds of $280,000.  After these draws by Mr. Katz, of the remaining UNO funds, only $1,036 was transferred to Mr. Levine's entity on March 9, 2006.  The remaining UNO proceeds were transferred to two entities jointly owned by Mr. Katz and Mr. Levine: on February 24, 2006, a transfer of $29,500 was made to RKH Real Estate, LLC ("RKH"), and, on March 16, 2006, a transfer of $49,464 was made to KHR Real Estate Holdings LLC.  Because those two entities - RKH and KHR - were jointly owned by Mr. Levine and Mr. Katz in equal parts, and

there is no evidence that the funds were later transferred to the exclusive use of either one of them, those amounts are income to each of them in equal amounts pursuant to 26 U.S.C. §61(a).

As such, rather than Mr. Levine having failed to report income of $280,000 in his taxable year 2006, he failed to report $40,518, which is the total of $1,036 (the amount he received through LL Real Estate) and half of $78,964 (the total amount transferred to the jointly held entities).

### 2.   RKH/HF Allen

The government takes the position that certain funds deposited into the account of RKH Real Estate, LLC ("RKH") in 2006 were taxable income to Mr. Levine. As such, the government argues that Mr. Levine was required, but failed, to report a total of $525,000 in additional income in 2006. We dispute that all of the amounts were income to Mr. Levine. Instead, only $75,000 of the funds at issue should have been reported by him, with the remaining $450,000 being income to Mr. Katz. As shown below, Mr. Levine acquired his interest in RKH by paying for it with unrelated post-tax dollars. A chart mapping these transactions is provided as Exhibit "F" and illustrates the below narrataive. (As with the PAF/UNO transactions, the back-up documents supporting the chart entries were provided to the government and are available should the Court wish to review them.)

RKH was a single-purpose entity that purchased, maintained and ultimately sold a house on Long Island. The house was purchased in 2006 by the expenditure of $520,000, consisting of the $500,000 purchase price paid in two installments, a $50,000 down-payment and the $450,000 balance at closing, as well as another $20,000 in closing costs. As set out on the chart, the funds used to acquire the house were from three sources: $450,000, an amount from a transaction known as "HF Allen" (received by RKH on April 27, 2006); $70,000 in two transfers (on

February 24 and March 16, 2006) from HRK, an entity jointly owned by Mr. Levine and Mr. Katz (and the funding of which is discussed in the PAF/UNO summary); and an additional $15,000 from another jointly-held entity, KHR, on May 1, 2006.

We focus first on the $450,000 HF Allen fee.  The government contends that the full amount was income to Mr. Levine.  The government rejects that the money was income to Mr. Katz, either entirely or on a joint basis, solely because it is the government's view, as we understand it, that Mr. Katz had nothing to do with RKH's purchase of the house and did not receive the benefit thereof.  According to the government, because the house was used as the residence of Mr. Levine's then mistress, there was no benefit to Mr. Katz.  We contend, on the other hand, that Mr. Katz was an active participant in the decision to purchase and to maintain the house; was an active participant in the purchase of the house itself (including both engaging RKH's attorneys for the purchase and providing the funds to those attorneys necessary for the deal);[3] and he bore the risks and potential rewards of an ownership interest for as long as he had an interest.

Certainly, the government offers no alternative explanation for the fact that Mr. Levine purchased an ever-increasing percentage ownership of RKH from Mr. Katz until he entirely bought out Mr. Katz by repaying him for the use of the HF Allen funds, as we now explain.

To acquire his initial interest in RKH (as a single purpose entity, there is little difference between an interest in the entity and an interest in the house it owns), Mr. Levine made a $200,000 payment to Mr. Katz (through King Louie Enterprises) on May 5, 2006, two days after the funds were disbursed from an escrow account for the purchase.  That payment, combined

---

[3] A print-out from RKH's attorneys' IOLA account, where funds were accumulated and dispersed in connection with the house purchase, is annexed as Exhibit "G".

with Mr. Levine's contribution of his half of HRK and KHR funds (noted *supra*) bought him half of the ownership of RKH and equalized (with Mr. Katz) Mr. Levine's contribution of capital to RKH.  Thereafter, through 2007, Mr. Levine and Mr. Katz made equal contributions of amounts to the venture for the upkeep of the house.  In 2007, the accountants for RKH issued Schedule K-1's for that tax year reflected that RKH was owned 50-50 by Mr. Levine and Mr. Katz and that each had contributed equally to its capitalization.  That is correct because the purchase of the house was made, and RKH capitalized, by Mr. Levine's payment of $200,000, plus half the funds from HRK and KHR – not because Mr. Levine used any of the HF Allen funds. Inexplicably, the government disregards the fact that Mr. Levine primarily purchased his initial 50% interest in RKH from Mr. Katz using post-tax dollars.  Because Mr. Levine's ownership interest in RKH was comprised of the amounts paid to RKH from jointly-held entities as well as his $200,000 payment to Mr. Katz, the Schedule K-1 for 2006 reflects his 50% interest in RKH. It is not because Mr. Levine "shared" in the HF Allen amount, let alone that he should be deemed to have earned it all.

In 2008, there were two changes to the percentage of ownership of RKH.  In March 2008, Mr. Levine wired $125,000 to Mr. Katz to pay Mr. Katz for an additional 25% ownership interest in the single purpose entity.  To corroborate that this $125,000 transfer from Mr. Levine was intended at the time to purchase a further quarter interest in RKH, we can look to the fact that throughout 2008, each funded the expenses of the house on that approximate percentage basis of 75% (Levine) – 25% (Katz).  At the end of 2008, Mr. Levine acquired the last 25% interest in RKH (which owned and maintained the house) by forgiving $125,000 in debt owed to him by Mr. Katz.  That is documented in multiple ways: First, the loan forgiveness is reflected

on a spreadsheet showing a 2008 forgiveness of $125,000 owed to Mr. Levine by Mr. Katz.[4]  It

is also confirmed by Mr. Katz's admission to the government in a proffer session on June 11,

2015.  There, he told prosecutors that he sold his interest in RKH to Mr. Levine, including by

Mr. Levine forgiving Mr. Katz's debt to Mr. Levine for a soured investment: a promise by Katz

to "Levine that he [Katz] would make Levine whole on his [Levine's] $500,000 investment in

MicroIslet".  With that last $125,000, that brought Mr. Levine's payments to Mr. Katz to full

reimbursement of the $450,000 that Mr. Katz had contributed to the RKH venture by way of all

of his HF Allen income.

The Schedules K-1 issued by the accountants for RKH's tax year 2008 do not (and could

not) reflect the intra-year change from 50%-50% to 75%-25% as these schedules are issued on

an annual basis.  However, the K-1s do reflect that by the end of 2008, Mr. Levine owned 99%

of RKH.  Consistent with this ownership interest, Mr. Levine assumed the entire responsibility

for the expenses of the house, as well as bearing the full tax consequences of the subsequent sale

of the house.

There is also the final $75,000 to address.  In 2006, an additional $75,000 was deposited

into the RKH account.  We have conceded that this amount was interest income to Mr. Levine

for a short term loan he and Mr. Katz made in connection with the RKH transaction.   Though

the amount was deposited into the RKH account, it was soon transferred to LL Real Estate and

should have been reported by Mr. Levine on his tax return for 2006.  However, the amount has

---

[4] The spreadsheet is attached as Exhibit "H".  It was previously provided to the IRS and
represented to be a running record, prepared over a number of years, of certain categories of
amounts owed by Mr. Katz to Mr. Levine.  Reflected on page 2 (admittedly in rather small print)
is a break out of credits to Mr. Katz that reduced his debt to Mr. Levine, showing the $125,000
debt forgiveness.

nothing to do with the capitalization of RKH and evidently was merely passed through the account.

In sum, the $450,000 from HF Allen was income to Mr. Katz, not to Mr. Levine.  Any use of those funds to acquire the RKH asset was fully reimbursed to Mr. Katz by Mr. Levine's payments to him.

### 3.   The State Tax Credit Unreported Income Adjustment

A schedule of amounts sent to Mr. Levine (LL Real Estate) in 2005 for State Tax Credit Transactions shows a cumulative amount of $56,057 for the year, comprised of the following amounts: $9,858 (February 2005); $6,529 (April 2005); $20,725 (June 2005); $6,529 (September 2005); and $12,416 (December 2005).  *See* Exhibit "I".[5]  The 2005 Schedule C of LL Real Estate reports all that income.  *See* Exhibit "J".  The government claims that in 2006, there was $258,441 in unreported income from State Tax Credit transactions, which we understand includes the $12,416 that was received by Mr. Levine in late 2005 and reported by Mr. Levine for tax year 2005.  Thus, the amount of unreported income for 2006 should be reduced by the $12,416 that was paid in 2005 and reported in 2005.

### 4.   The Correct Tax Loss/Restitution Amount

Adjustments should be made for the wrongly included loss amounts for 2006 (UNO Estates in the amount of $280,000; RKH, in the amount of $525,000), and instead including as unreported income the proper amounts for those transactions ($40,518 from UNO Estates; $75,000 from RKH), as well as the wrongful inclusion of $12,416.  As such, the total unreported income for 2006 is $361,546.  Adding those to the government's numbers, the total unreported

---

[5] These pages are taken from documents sent to Mr. Levine by the person administering the State Tax Credit funds.

income for the entire period covered by Count One (including the unreported income for 2008 charged in Count 3), is $2,155,369.  Re-computing the tax owed for each of those years (without penalty and interest but just the tax loss), Mr. Levine is responsible for a total tax loss of $998,424, of which $769,331 is attributable to unpaid federal tax and a state and city tax loss of $229,093.  Restitution should be in the amount of $769,331.

## Conclusion

For all the reasons stated herein, we urge the Court to impose a non-jail sentence in this case. If the Court believes that additional punishment is necessary, we ask that the Court consider imposing a condition of community confinement or home detention, with a significant community service component, so that Mr. Levine can begin to put his life back together as quickly as possible.

October 4, 2017

Respectfully submitted,

GERALD B. LEFCOURT, P.C.

By: _____/s/_____
         Gerald B. Lefcourt
         Sheryl E. Reich

1841 Broadway/Suite 910
New York, N.Y. 10023
(212) 737-0400 (phone)
(212) 988-6192 (fax)
lefcourt@lefcourtlaw.com
reich@lefcourtlaw.com
*Attorneys for Harold Levine*

## **Index to Exhibits**

Exhibit A -    Letter of Marilyn Garber

Exhibit B -    Letter of Harold Levine

Exhibit C -    All other letters to the Court, in alphabetical order

Exhibit D -    Herrick billing records re VMG transaction

Exhibit E -    UNO Estates Chart and narrative

Exhibit F -    RKH/HF Allen Chart and narrative

Exhibit G -    Westerman Ball Ederer Miller & Sharfstein, LLP, IOLA account

Exhibit H -    Running Balance of Payments

Exhibit I -    Amounts dispersed to LL Real Estate in 2005 for State Tax Credit transactions

Exhibit J -    2005 Schedule C for LL Real Estate