UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                        :

UNITED STATES OF AMERICA,               :

            - v. -                      :          16 Cr. 715 (JSR)

HAROLD LEVINE,                          :

                                        :
                Defendant.
                                        :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


### GOVERNMENT'S SENTENCING MEMORANDUM
### REGARDING DEFENDANT HAROLD LEVINE

                                        JOON H. KIM
                                        Acting United States Attorney for the
                                        Southern District of New York

STANLEY J. OKULA, JR.,
Special Assistant United States Attorney
DANIEL S. NOBLE
Assistant United States Attorney

        - Of Counsel -

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                :

**UNITED STATES OF AMERICA,**        :

    **- v. -**                  :        **17 Cr. 715 (JSR)**

**HAROLD LEVINE,**              :

                           :

        **Defendant.**

                           :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### GOVERNMENT'S SENTENCING MEMORANDUM
### REGARDING DEFENDANT HAROLD LEVINE

      The United States respectfully submits this memorandum for the Court's consideration in connection with the sentencing of defendant Harold Levine ("Levine" or "the defendant"), which is scheduled for October 11, 2017. Through this memo, we (1) review some of the offense conduct of the defendant; (2) address certain Sentencing Guidelines issues; and (3) explain the Government's position regarding the appropriate sentence.

### Preliminary Statement

      The facts in this case demonstrate that defendant Harold Levine – a tax lawyer with an LLM in taxation – engaged in a multi-year tax evasion scheme through which he fraudulently failed to report approximately $3 million in income. In carrying out the scheme, Levine was animated not by financial need but by unchecked greed, choosing to illicitly pocket rather than compliantly pay approximately $1 million in income taxes due and owing to his principal victim (the Internal Revenue Service) and additional amounts to two indirect victims (New York State and New York City).

Levine's multi-year role as the architect and financial beneficiary of the tax fraud scheme to which he pleaded guilty warrants a significant term of imprisonment within the advisory Sentencing Guidelines range of 37 to 46 months calculated by the Probation Department in the Presentence Investigation Report ("PSR"). We respectfully submit that a sentence below that range would fail to serve the essential sentencing goals of just punishment, general deterrence, and promotion of respect for the rule of law.

## I.  <u>PERTINENT FACTS</u>

The facts undergirding Levine's offense are detailed in the Indictment and the (largely un-objected-to) PSR and will not be repeated at length herein. The following facts, however, bear emphasizing.

First, Levine's conduct was discovered by the Herrick Feinstein law firm—of which Levine was formerly a partner and head of the Tax Department—in or about August 2012, when the firm discovered that the IRS was investigating both Levine and the firm as "material advisors" in connection with numerous tax shelter transactions that Levine worked on for firm clients. Up until that point in time, Levine had not disclosed to the firm the full scope of the IRS's inquiry, much less that he had retained a tax attorney to represent both Levine and the firm in connection with the IRS's inquiry.

When the firm confronted Levine in September 2012 about the client fees that had been routed by Levine to LL Real Estate—the vehicle Levine utilized surreptitiously to receive the lion's share of the unreported income—Levine told the firm that those fees did not constitute income to him. Rather, Levine told the firm that the income belonged to co-defendant Ronald Katz, which Levine agreed to receive through LL Real Estate to assist Katz in hiding money from his wife during divorce proceedings. Through his guilty plea, Levine has now effectively

acknowledged that the fees routed to LL Real Estate constituted income to him.

Second, Levine continues to refuse to acknowledge the full extent of his culpability, claiming for instance that the $525,000 that he caused to be routed in May 2006 to a partnership entity (to purchase a house for a former firm employee with whom he shared a close personal relationship) did not constitute income to Levine. Levine advances that argument based on the claim that, following the transfer of the $525,000, co-defendant Katz and Levine engaged in a series of financial transactions that changed the initial 50/50 ownership structure they shared.

What this argument fails to account for, however, is that the $525,000 constituted income to Levine at the moment he took control of the funds by directing they be sent from the Herrick Feinstein escrow account to a partnership that Levine co-owned. Stated otherwise, because Levine had exclusive dominion and control of the funds, it did not matter where he sent them. What did matter is that Levine had the ability to send them where he wished. Finally, the fact that the funds were used to purchase a home for someone with whom he was then enjoying a personal relationship is not a complete coincidence in this analysis.

Finally, it bears emphasizing that Levine not only made false statements to the IRS during the audit, he also coached another witness to testify falsely (specifically, the former firm employee with whom he shared a close personal relationship). Although this conduct, to be sure, is taken into consideration through the Guidelines calculation, we submit that it is vitally important as a Section 3553(a) factor with respect to the need for deterrence; the seriousness of the offense; and the need to promote respect for the law.

## II.    SENTENCING GUIDELINES ISSUES

Levine advances two challenges to the Sentencing Guidelines range determined by Probation and contained in the PSR.   First, he contends that an "obstruction of justice" enhancement under U.S.S.G. § 3C1.1 is inappropriate because obstruction is part of the offense of conviction and, therefore, should not be separately applied in adjusting his offense level upward. This argument is meritless because it flies in the face of the applicable Guideline and commentary. In particular, Application Note 7 to § 3C1.1 makes clear that an obstruction enhancement under § 3C1.1 is "inapplicable" only if the defendant is convicted of an offense "covered by § 2J1.1 . . . ."   Here, it is undisputed that Levine's offense under 26 U.S.C. § 7212(a) is covered by U.S.S.G. § 2T1.1, since Levine did not object to the use of that Guideline in calculating his offense level.   *See* PSR ¶ 46.   In any event, even if Levine's § 7212(a) offense were treated like a traditional, narrowly-circumscribed "obstruction" offense, Application Note 8 to § 3C1.1 makes plain that where, as here, the defendant is convicted of both an obstruction offense and an underlying offense, "the offense level [for the grouped offenses] will be the offense level for the underlying offense increased by the 2-level adjustment specified [under § 3C1.1]." Consequently, Levine's Count Three tax evasion offense level (including the losses for the 2008 tax year plus all relevant conduct) is increased by two levels from § 3C1.1.

Levine's second Guidelines challenge relates to the two-level adjustment under § 2T1.1(b)(1), based on Levine's failure "to report or to correctly identify the source of income exceeding $10,000 in any year from criminal activity."   This adjustment is appropriate because Levine concededly received fees from tax shelter promoters in 2008, at a time when he was party

to Herrick Feinstein's written partnership agreement. That agreement, signed by Levine, provided in pertinent part that:

> *All compensation received by an Equity Partner* in the categories described in Section 6.2.2 and 6.2.3 below *is the Partnership's property and shall be treated as part of Partnership income* and, at the discretion of the Executive Committee, shall either be turned over to the Partnership by the Equity Partner receiving such compensation or shall be retained by such Equity Partner but accounted for as, and charged against his distributive share of Partnership income. Expenses related to the production of such income shall be chargeable to the Partnership to the extent deemed reasonable by the Executive Committee . . . .

Partnership Agreement Section 6.2.1 (emphasis added). "Compensation" is defined in § 6.2.2 of the Partnership Agreement as:

> (i) compensation of any kind, whether cash or non-cash, for any legal services; (ii) directors' fees and corporate salaries; (iii) fiduciary fees or commissions, to the extent permitted by law; (iv) finders' fees or brokers' commissions; (v) co-counsel fees; government salaries or other compensation; fees or honorariums for teaching or speaking on, and fees or royalties for writing on, legal subjects or subjects arising from or related to the firm's practice or the practice of law generally.

Moreover,

> In all events, *every Equity Partner is duty bound to advise the Executive Committee of all such forms of compensation,* directly or indirectly, received or receivable by him or her.

(emphasis added).[1]   Under these clear definitions, the fees that Levine received from tax shelter

---

[1]   The Herrick partnership agreement had an additional provision concerning "investment opportunities" offered to partners by clients. Those opportunities were deemed to be "firm opportunities." Excluded from "firm opportunities," however, were those "aris[ing] from longstanding personal relationships, relationships that do not arise from a partner's role at the firm and/or in the course of employment at the firm, and which will not involve more than a de minimis amount of timw . . . ." The "excluded opportunities" definition also stated that such opportunities "should be reported to the Investment Committee." The fees that Levine diverted from the firm were not "investment opportunities" because they were paid to Levine for tax shelter transactions that were closing, or being worked on, during the years at issue. Moreover, there was no

clients while he was a signatory to the 2008 partnership agreement constituted property of the partnership. Levine was thus obligated to remit those fees to the firm. His fraudulent diversion of those fees plainly rendered them criminal proceeds under § 2T1.1(b)(1).

## III. SENTENCING LEGAL PRINCIPLES

We are thoroughly aware of the Court's familiarity and facility with the Sentencing Guidelines and the law of sentencing, particularly in this post-*Booker* age. We nonetheless think it helpful to review briefly the governing legal principles in this area.

While the Sentencing Guidelines are no longer mandatory, they nevertheless continue to play a critical role in trying to achieve the "basic aim" that Congress tried to meet in enacting the Sentencing Reform Act, namely, "ensuring similar sentences for those who have committed similar crimes in similar ways." *United States* v. *Booker*, 543 U.S. 220, 252 (2005); *see United States* v. *Crosby*, 397 F.3d 103, 113 (2d Cir. 2005) ("[I]t is important to bear in mind that *Booker/Fanfan* and section 3553(a) do more than render the Guidelines a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge."). The applicable Sentencing Guidelines range "will be a benchmark or a point of reference or departure" when considering a particular sentence to impose. *United States* v. *Rubenstein*, 403 F.3d 93, 98-99 (2d Cir. 2005). In furtherance of that goal, a sentencing court is required to "consider the Guidelines 'sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant,' the pertinent Sentencing Commission policy statements, the need to avoid

---

"investment" component to those fees, such that there was market risk or other factors that made the receipt of them "contingent," as any genuine "investment" would be.

unwarranted sentencing disparities, and the need to provide restitution to victims." *Booker, id.* at 260 (citations omitted); *see also id.* at 264 ("The district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing.").

Apart from the Sentencing Guidelines, as the Court is well aware, the other factors set forth in Title 18, Section 3553(a), must be considered. Section 3553(a) directs the Court to impose a sentence "sufficient, but not greater than necessary" to comply with the purposes set forth in paragraph two. That sub-paragraph sets forth the purposes as:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

Section 3553(a) further directs the Court "in determining the particular sentence to impose" to consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the statutory purposes noted above; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range as set forth in the Sentencing Guidelines; (5) the Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense. *See* 18 U.S.C. § 3553(a).

In light of *Booker*, the Second Circuit has instructed that district courts should engage in a three-step sentencing procedure. *See Crosby*, 397 F.3d at 103. First, the Court must determine the applicable Sentencing Guidelines range, and in so doing, "the sentencing judge will be entitled

to find all of the facts that the Guidelines make relevant to the determination of a Guidelines sentence and all of the facts relevant to the determination of a non-Guidelines sentence." *Id*. at 112; *see also United States* v. *Corsey,* 723 F.3d 366, 375 (2d Cir. 2013) ("Even in cases where courts depart or impose a non-Guidelines sentence, the Guidelines range sets an important benchmark against which to measure an appropriate sentence."). Second, the Court must consider whether a departure from that Guidelines range is appropriate. *Id*. Third, the Court must consider the Guidelines range, "along with all of the factors listed in section 3553(a)," and determine the sentence to impose. *Id*. at 113. In so doing, it is entirely proper for a district judge to take into consideration his or her own sense of what is a fair and just sentence under all the circumstances. *See United States* v. *Jones*, 460 F.3d 191, 195 (2d Cir. 2006).

### IV.    Section 3553(a) Analysis

Although the Guidelines, as set forth above, are no longer binding, they reflect the seriousness of the offenses of conviction and the particular aggravating factors relating to Levine's criminal conduct. We respectfully submit that a term of incarceration within the Guidelines range calculated by Probation is warranted and necessary in order to provide just punishment, afford adequate general deterrence, and promote respect for the law.

### A.  The Nature and Circumstances of the Offenses

It goes without saying that tax offenses are serious, costly, and damaging to our nation's system of taxation and the public fisc. *See United States* v. *Ture*, 450 F.3d 352, 357 (8th Cir. 2006) ("The criminal tax laws are designed to protect the public interest in preserving the integrity of the nation's tax system."). The Internal Revenue Code, § 6151(a), sets forth the general rule

of our voluntary federal tax system: "Except as otherwise provided, when a return of tax is required under this title or regulation, the person required to make such return, shall, without assessment or notice and demand from the Secretary, pay such tax to the internal revenue officer with whom the return is filed, and shall pay such tax at the time and place fixed for filing the return."   The tax offense at issue in this case has cost the United States Treasury, and the nation's honest taxpayers, not only the taxes that should have been paid, but the time value of the money—that is, the interest on the unpaid taxes.   The offense conduct also resulted in significant losses to the New York State and New York City taxing authorities.

**B.  History and Characteristics of the Defendant**

Although Levine has no formal criminal history points under the Sentencing Guidelines, the term "first time offender" is not entirely appropriate.   As the PSR makes clear, Levine was charged with and DWI offense in Suffolk County in 1999.   Although the PSR indicates that there was no "Court Reported Information" with respect to the disposition in that case, a recent check by IRS representatives indicates that Levine pleaded guilty to a misdemeanor offense on or about September 1, 1999, resulting in the imposition of a $400 fine.

With respect to the defendant's financial profile, unlike many of the defendants who appear before this Court, Levine has enjoyed significant financial success and material comforts (such as an East Hampton home (PSR ¶ 125)), yet committed these serious crimes in spite of those advantages and as a result of pure greed.   It is evident from the PSR and Levine's background and personal circumstances that he did not commit these crimes out of any genuine financial need. Indeed, by many accounts Levine is a successful tax attorney (and now businessman) who has

enjoyed the support of his family and friends. In sum, the defendant has enjoyed a life of financial stability, filled with benefits that many people can never hope to receive. But despite those successes, Levine designed and perpetrated his tax fraud scheme for over seven years in order further to enrich himself and co-defendant Ron Katz.[2]

Levine has submitted letters from family, friends, and colleagues attesting to his good character and expressing support. It is, of course, entirely appropriate for the Court to take these letters into account in connection with sentencing. However, the Government respectfully submits that in so doing, the Court should also consider the following three points. First, the attestations to Levine's good character do not meaningfully distinguish him from the typical white-collar defendant. Instead, as Judge Marrero astutely observed, this collection of letters

> falls into a pattern advanced by a subset of the white collar criminal. This category encompasses a select class: distinguished, reputable, highly esteemed model citizens such as this defendant. The list of their achievements and virtues is long and impressive. Let us count the ways. At home, they are good family men and women, caring spouses, loving parents, loyal and reliable to friends. At work, they are looked up to as outstanding professionals and business partners. To their community's charities and public causes they are generous patrons and sponsors.

*United States* v. *Regensberg*, 635 F. Supp. 2d 306 (S.D.N.Y. 2009), *aff'd*, 381 F. App'x 60 (2d Cir. 2010); *see also United States* v. *McClatchey*, 316 F.3d 1122, 1135 (10th Cir. 2003) ("excellent character references are not out of the ordinary for an executive who commits white-collar crime; one would be surprised to see a person rise to an elevated position in business if people did not think highly of him or her"). In other words, the letters proffered by Levine are in many ways

---

[2] The investigation revealed that at one point during which Levine and Katz were carrying out the tax fraud scheme, both bought Aston Martin automobiles.

typical of the letters submitted by many white-collar criminals, and do not set Levine apart from other similarly situated defendants.

Second, to the extent that the letter writers hint that the humiliation and loss of social standing suffered by Levine as a result of his guilty should be given paramount consideration, that claim should be rejected. "It is impermissible for a court to impose a lighter sentence on white-collar defendants than on blue-collar defendants because it reasons that white-collar offenders suffer greater reputational harm or have more to lose by conviction." *United States* v. *Prosperi*, 686 F.3d 32, 47 (1st Cir. 2012). Similarly, the loss of personal or professional standing, the legal fees he has incurred, and the felony convictions associated with his name are not factors this Court should take into account. "None of these things are his sentence. Nor are they consequences of his sentence; a diminished sentence based on these considerations does not reflect the seriousness of his offense or effect just punishment." *United States* v. *Musgrave*, 761 F.3d 602, 608 (6th Cir. 2014) (quotations omitted); *see also United States* v. *Kuhlman*, 711 F.3d 1321, 1329 (11th Cir. 2013) ("The Sentencing Guidelines authorize no special sentencing discounts on account of economic or social status."). And, as the Seventh Circuit has observed:

> [N]o "middle class" sentencing discounts are authorized. Business criminals are not to be treated more leniently than members of the "criminal class" just by virtue of being regularly employed or otherwise productively engaged in lawful economic activity. It is natural for judges, drawn as they (as we) are from the middle or upper-middle class, to sympathize with criminals drawn from the same class. But in this instance we must fight our nature. Criminals who have the education and training that enables people to make a decent living without resorting to crime are more rather than less culpable than their desperately poor and deprived brethren in crime.

*United States* v. *Stefonek*, 179 F.3d 1030, 1038 (7th Cir. 1999).

Third, while there certainly are cases where a defendant's offense conduct was in some way wildly aberrant or representative of so brief and isolated a lapse in judgment that it is appropriate to give significant weight to an otherwise blameless life, this demonstrably is not such a case. For over seven years, Levine participated in tax fraud designed to cheat the IRS and New York State taxing authorities. That cheating involved the signing of multiple false tax returns under penalty of perjury. He lied repeatedly to his accountant, who was used by Levine as a pawn in an attempt to hide his fraud. He cheated his partners at Herrick Feinstein by diverting fees that rightfully belonged to the firm.

Given the foregoing, even crediting any testimonials that Levine has submitted in connection with sentencing—and we do not in any way question the sincerity of those testimonials –the defendant, through his greed-driven criminal conduct, has shown that he is not someone who deserves any benefit of the doubt with respect to this Court's judgment of his character.

In short, Levine's good works and devotion to friends and family are simply outweighed by the magnitude and duration of his criminal conduct.

## C.  The Need to Afford Adequate Deterrence

One of the paramount factors the Court must consider in imposing sentence under Section 3553(a) is the need for the sentence to "afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(B). The Government respectfully submits that a significant term of imprisonment—that is, within or approaching the applicable Guidelines Range—is essential to achieve adequate general deterrence, especially given the nature of the tax fraud scheme involved.

As a result of the significant resources required to mount a criminal tax prosecution, criminal tax prosecutions are relatively rare.   As the Sentencing Commission explained:

> The criminal tax laws are designed to protect the public interest in preserving the integrity of the nation's tax system.   Criminal tax prosecutions serve to punish the violator and promote respect for the tax laws.   Because of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the tax laws is a primary consideration underlying these guidelines.   Recognition that the sentence for a criminal tax case will be commensurate with the gravity of the offense should act as a deterrent to would-be violators.

U.S.S.G. ch 2, pt. T, introductory cmt.   Where the incidence of prosecution is lower, the level of punishment must be higher to obtain the same level of deterrence. *See generally* Louis Kaplow and Steven Shavell, "Fairness Versus Welfare," 114 Harv. L. Rev. 961, 1225-1303 (2001); *see also United States v. Hassebrock*, 663 F.3d 906, 922 (7th Cir. 2011) (affirming as reasonable a within-Guidelines 32-months sentence for a tax evader when the district court explained that "a sentence of probation would not promote respect for the law, but encourage people to flaunt it").

General deterrence is an indispensable means of minimizing the ever-increasing amount of money estimated to be lost each year through tax fraud.   The United States tax system relies on voluntary compliance.   The IRS's most recent study of tax compliance estimates that only 83.1% of individuals are compliant, leaving a yearly tax gap of over $458 billion dollars in unreported and uncollected taxes.   *See* "Tax Gap Estimates for Tax Years 2008-2010," April 2016 (attached hereto as Exhibit A).   "Studies have shown that salient examples of tax-enforcement actions against specific taxpayers, especially those that involve criminal sanctions, have a significant and positive deterrent effect." Joshua D. Blank, *In Defense of Individual Tax Privacy*, 61 Emory L.J. 265, 321 (2011-2012).

These studies emphasize the impact that noncompliance with the tax code has on the United States Treasury and the deterrent impact prison sentences have on other potential tax scofflaws. Hundreds of billions of dollars are lost annually because people like Levine—who otherwise take full advantage of all that taxes bring, such as schools, paved roads, transit systems, and Government buildings—shirk their responsibilities as American taxpayers. Widespread noncompliance with the Internal Revenue Code is an ongoing problem that merits every court's consideration when sentencing defendants for committing tax offenses. Meaningful sentences— that is, ones that, through their terms, speak loudly and clearly—must be given in cases, like this one, so that others are forewarned of the consequences for engaging in significant tax crimes.

The Fourth Circuit has explicitly endorsed the vital importance of incarcerating tax scofflaws as a means of general deterrence:

> Given the nature and number of tax evasion offenses as compared to the relatively infrequent prosecution of those offenses, we believe that the Commission's focus on incarceration as a means of third-party deterrence is wise. The vast majority of such crimes go unpunished, if not undetected. Without a real possibility of imprisonment, there would be little incentive for a wavering would-be evader to choose the straight-and-narrow over the wayward path.

*United States* v. *Engle*, 592 F.3d 495, 502 (4th 2010). Similarly, Judge Edward Weinfeld, one of the great Judges of this Court, aptly articulated, in a pre-Guidelines setting, the need for incarceration as a result of the tax evader's violation of the basic compact under which all American income-earners live:

> This court has long had the view that income tax evasion cases where defendants are found guilty, whether upon their pleas of guilty or after jury verdict, require a term of imprisonment. The income tax laws of our country in effect reflect an honor system under which the citizens are required to cooperate with the government, to file true and accurate returns. I have been of the view that unless

a citizen lives up to his responsibility there must follow, barring an extraordinary situation, a term of imprisonment as an example to other people in the community.

*United States* v. *Tana*, 85 Cr. 1119 (EJW) (S.D.N.Y. June 17, 1986; Tr. at 12-13); *see also United States* v. *Trupin*, 475 F.3d 71, 76 (2d Cir. 2007) (seven-month prison sentence for multi-year tax evasion scheme with a tax loss of $1.2 million failed to reflect seriousness of offense, observing that a tax evader, in effect, "steal[s] from his fellow taxpayers through his deceptions"). In a recent case involving a business owner defendant who diverted corporate receipts over a three year period (resulting in a tax loss of between $250,000 and $550,000 and a Sentencing Guideline range of 18-24 months), Judge Hellerstein imposed an 18-month sentence on the 54-year old first time offender, explaining that:

> I think the obligation to pay taxes is basic to our civilization. It makes it possible to have a lawful society. You read every day of crimes and violence in our country. But so much so in so many other countries where people can't get out of their house without fearing their lives. Where the path of getting food is strewn with threats and violence against them.

> In order to have a society, you must have money. You must be able to pay what society requires. And its basic functions of policing and other functions of making sure there is a safety net under people. If people don't pay their taxes, they cheat each other. Your not paying taxes cheats me. If I don't pay my taxes, I cheat you. It's as bad, in many ways, as ripping off the delivery worker that the last fellow did. You're ripping off everybody else by not paying your share of taxes. So I look upon this and I think the guidelines have it right here. I think a year and a half, 18 months, is a just sentence. I impose it.

> I think you're going to have to reflect on what you did and the seriousness of what you did. You just can't make it good by paying the back tax. You've got to understand that when you do something bad, you get punished. It's got to be a lesson to everyone else. Everyone else is tempted to draw a line and cheat a little bit, get an extra edge.

*United States* v. *Joseph Ciccarella*, 16 Cr. 738 (AKH) (Tr. at 22-23) (attached hereto as Exhibit

B).

In sum, the Government cannot ensure compliance with the Internal Revenue Code if the general public believes there are no meaningful repercussions for failing to comply with tax laws and regulations. Sentencing Levine to a meaningful term of incarceration will convey the message to others that systematic and repeated efforts to cheat on one's taxes will be met with meaningful punishment.

**D.      The Need to Avoid Unwarranted Sentence Disparities**

The Sentencing Guidelines were promulgated, in significant measure, to minimize disparities in federal sentences.   Although those Guidelines are no longer mandatory, the importance of eliminating sentencing disparities remains an important factor which the Court must separately consider pursuant to 18 U.S.C. § 3553(a)(6).   Towards that end, we attach for the Court's consideration a chart of sentences in other tax cases (or cases that had a significant tax component), including ones with comparable loss amounts. *See* Exhibit C (the "Sentencing Chart").   The Sentencing Chart breaks out the sentences imposed and various other sentencing data in a broad variety or criminal tax contexts.

Although we believe that there is significant utility in having Your Honor consider sentencings in other tax cases, we hasten to note our acute awareness that, at best, such guidance can get the Court only so far.   Every case is unique; every individual defendant is unique.   We do not mean to suggest otherwise.   The reasons for our reference to the other relevant sentences are straightforward.   First, while we fully recognize that the recommendations made by Probation and the Government herein call for a substantial sentence, similar sentences have been meted out

in cases involving comparable overall conduct and tax losses.   Second, it is not uncommon for defendants who are less criminally culpable than Levine to receive and serve lengthy sentences of incarceration.  And third,  courts  have  not  refrained  from  imposing  significant  periods  of incarceration  in  cases  involving  defendants  in  Levine's  age  category  (or  even  years  older), particularly where, as here, the criminal conduct is long-running and results in a significant tax loss.

## V.  The Appropriate Sentence

The Government submits that a sentence within the applicable Guidelines Range of 37 to 46 months will best serve the ends of justice and achieve the legitimate goals of sentencing under 18 U.S.C. § 3553(a).

Any argument or suggestion that Levine has been punished enough by the loss of his law license, reputation, or occupational standing, or that he will be required to pay restitution and a fine, should be rejected.   According to this logic, abundantly successful lawyers or businessmen should  not  be  sent  to  jail  for  committing  the  same  crime  that  would  justify  a  sentence  of imprisonment  for  a  less  successful  defendant  or  one  who  enjoys  a  smaller  standing  in  the community.   We respectfully submit that the Court should reject the notion that a well-heeled defendant should be sentenced more lightly than the poor or powerless because, for the former, the humiliation and shame of conviction alone is more devastating than it would be for those who have enjoyed fewer advantages in life. In short, Levine should not be permitted to buy his way out of a significant term of incarceration.

We also respectfully submit that a meaningful term of imprisonment is warranted for general  deterrence  reasons,  would  reflect  the  seriousness  and  scope  of  Levine's  fraudulent

conduct, would achieve just punishment, and would promote respect for the law.    A tax attorney—or any taxpayer, for that matter—contemplating the potential fruits of a tax fraud scheme should see and know that a meaningful jail term is its likely consequence.    A sentence involving minimal jail time or home confinement for Levine, on the other hand, would rightly be perceived as a slap on the wrist and would serve to deter no one.

## <u>CONCLUSION</u>

The orderly financial functioning of this country depends largely upon voluntary compliance with the internal revenue laws by all citizens, regardless of wealth or status.    That system of voluntary compliance would crumble if tax lawyers who engage in sustained tax fraud schemes believed they could cheat with impunity or that the most severe sanctions that they would face when caught were merely the payment of financial penalties and a short stint in prison. Moreover, a term of imprisonment is indispensable in a case like this one, lest the fraud perpetrated by the defendant breed skepticism among honest taxpayers and lead them to ask, "Why follow the law if there are no meaningful consequences for flouting it?"

On the facts of this case, a sentence within the applicable Guidelines Range is entirely appropriate and eminently just. Such a sentence would be sufficient, but not greater than necessary, to comply with the statutory imperatives of the sentencing statutes.

Dated:   New York, New York
           October 4, 2017

                                 Respectfully submitted,

                                 JOON H. KIM
                                 Acting United States Attorney
                                 Southern District of New York

By:       //s// Stanley J. Okula, Jr.
                                 STANLEY J. OKULA, JR.
                                 Special Assistant U.S. Attorney
                                 (212) 637-1585
                                 DANIEL S. NOBLE
                                 Assistant U.S. Attorney
                                 (212) 637-2239

## CERTIFICATE OF SERVICE

I hereby certify that this document, filed through ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and that paper copies will be sent to those indicated as non-registered participants on the above date.

By:       //s//Stanley J. Okula, Jr.

STANLEY J. OKULA, JR.
Assistant United States Attorney
(212) 637-1585
stan.okula@usdoj.gov